**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 08-809 Judge Nora Barry Fischer |
| v. | ) ) | |
| HUSSEY COPPER LTD., | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

I.    **Introduction**

This case involves Plaintiff, the Equal Opportunity Commission's ("EEOC"), claim under Title I of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101, *et seq.*, and Title I of the Civil Rights Act of 1991 against Defendant, Hussey Copper Ltd. ("Hussey"). The EEOC brought suit to challenge the employment practices of Hussey regarding its treatment of disabled applicants and to provide appropriate relief to Donald Teaford ("Teaford"), who the EEOC claims was adversely affected by such practices. (*See* Docket No. 23). In its Amended Complaint, the EEOC alleges that Hussey discriminated against Teaford because he was a recovering addict in a supervised rehabilitation program when it withdrew his conditional offer of employment. (*Id.* at 3-4). The EEOC seeks a permanent injunction against Hussey preventing it from engaging in further discriminatory practices on the basis of disability, as well as damages including back pay for Teaford. (*Id.* at 4-5). The matter comes before the Court on Hussey's Motion for Summary Judgment. (Docket No. 35). Upon consideration of the parties' filings, and for the following reasons, Hussey's Motion is DENIED.

## II.    Factual Background

Unless otherwise specified, the facts of record are uncontested. Viewed in the light most favorable to the EEOC, they are as follows.

### A.    The Parties

#### 1.    Donald Teaford

Donald Teaford is 53 years old and has worked throughout his adult life in the military and industrial settings. (Docket No. 45 at ¶¶ 132-135). He has completed community college courses in electronics technology, and in the 1970s, he apprenticed as a machinist. (*Id.* at ¶ 133). Teaford served in the Air Force between 1974 and 1979 as an electronics technician, and in the 1980s he worked as a laboratory technician at Mobay Chemical. (*Id*)  His duties with the Air Force included repair and maintenance of radar navigation and bomb plotting systems, and operation of various milling machines. (*Id.* at ¶ 134). Subsequently, he worked in the automotive industry at General Motors Corporation as a manufacturing engineer and, after he was laid off, he worked as an electronics service technician, plastics extruder operator, and was employed by a steel company where he performed production jobs in a steel plant. (*Id.* at ¶¶ 133, 134).

At the time he applied for a position with Hussey in July 2007, Teaford was recovering from a prior addiction to illegal opiates, including Oxycodone.[1] (Docket No. 45 at ¶ 132). His treatment for same included participation in drug treatment and counseling with Health Masters, Inc.[2] ("Health Masters"), an out-patient methadone clinic he entered on May 1, 2007. (*Id.*). Throughout his

---

[1]

Oxycodone is a narcotic pain reliever. It is similar to morphine and is used to treat severe pain. *See* http://www.drugs.com/search.php?searchterm=oxycodone&is_main_search=1; last visited March 11, 2010.

[2]

Health Masters, Inc. is a methadone treatment clinic located in Aliquippa, Pennsylvania. *See* http://health-masters.org; last visited March 8, 2010. It is "dedicated to treating opiate addiction through medication management, counseling services, and psychiatric and medical referrals." *Id.*

employment, he was never disciplined or discharged because of drug use. (*Id.* at ¶ 133).

### 2.    Hussey Copper, Ltd.

Hussey is in the business of casting, rolling, extruding and fabricating copper and copper alloy products.[3] (Docket No. 36 ¶ 1). Hussey employs approximately 350 salaried and hourly employees in its facilities in Leetsdale, Pennsylvania, which include a fully integrated copper mill where copper and metal alloys are melted, rolled, packaged and shipped to customers. (*Id.* at ¶¶ 2-3). The mill includes blast furnaces and casting areas, large pits containing open and exposed flames, moving molten metal, cranes, rolling mills, acid and lead baths, forklift trucks, coils of copper traveling above and knives used to cut copper. (*Id.* at ¶ 3).

The United Steelworkers of America represents the hourly and salaried employees at Hussey and their employment is governed by a collective bargaining agreement. (*Id.* at ¶¶ 4-5). Said agreement contains a seniority provision requiring vacant positions to be filled through posting and bidding, thereby allowing qualified current employees to fill vacancies based on their seniority. (*Id.*). Under the agreement, any newly hired production employee is initially hired as laborer and assigned various production jobs in the mill, acting as a "floater" at times, and is required to serve a probationary period of 100 hours of actual work. (*Id.* at ¶¶ 6-7).  In particular, production laborers work throughout the mill on an as-needed basis and rotate assignments until they can bid on a permanent position. (*Id.* at ¶¶ 8-9).  All production and maintenance positions in Hussey's mill are considered safety sensitive positions. (*Id.*).

### B.    Teaford's Conditional Offer of Employment

In July 2007, Hussey began reviewing applications to hire five or six new production laborers in the manufacturing area of the mill. (*Id.* at ¶ 10). Teaford completed an application for an hourly

---

[3]

*See also* http://www.husseycopper.com; last visited March 8, 2010.

production laborer position on July 25, 2007. (*Id.* at ¶ 11). Every production job to which Teaford would have been assigned would have been a safety sensitive position. (*Id.* at ¶ 12; Docket No. 45 at ¶ 12). Indeed, Teaford knew that there were safety risks and dangers in working in a mill environment. (Docket No. 36 at ¶ 13; Docket No. 45 at ¶ 13). He was interviewed for a position as a laborer in the Production Department on July 27, 2007. (*Id.* at ¶ 14). Wendy Jones, a Human Resources Generalist with Hussey, contacted Teaford by telephone on July 28, 2007 and informed him that he was being given a conditional offer of employment as a production laborer. (*Id.* at ¶ 15). His offer was conditioned upon his passage of a physical and drug test, and the satisfactory completion of a background check. (*Id.*).

### C.      Teaford's Physical Examination

Teaford was referred to Heritage Valley Health System – Business Care[4] ("Heritage Valley"), located in Hopewell, Pennsylvania, for his pre-employment, post conditional offer physical. (Docket No. 36 at ¶ 16; Docket No. 45 at ¶ 16). Heritage Valley is an occupational medicine facility that provides professional medical screening to its clients, including evaluations for pre-employment physicals, company physicals, drug screening, and other occupational medicine needs. (Docket No. 45 at ¶ 65). Heritage Valley is the only facility that Hussey contracts with for these services in Pennsylvania. (*Id.* at ¶ 65).

On July 30, 2007, Nurse Practitioner Elizabeth Salyards conducted Teaford's physical examination at Heritage Valley. (Docket No. 36 at ¶ 17; Docket No. 45 at ¶ 17 ). As part of his evaluation, Teaford completed a medical history record form, which asked if a doctor or clinic had

---

[4]

Heritage Valley Health System - Business Care provides comprehensive occupational medicine services to more than 1,200 area companies through Heritage Valley Health System. *See* http://www.heritagevalley.org/services/BusinessCare.aspx; last visited March 8, 2010. Its current Practice Manager is Rosemary Morelli, BSN, Certified Occupational Health Nurse Specialist. *Id.*

treated him in the past five years or if he was currently taking any prescribed drugs. (Docket No. 36 at ¶¶ 19-20; Docket No. 45 at ¶¶ 19-20). Teaford failed to disclose that he was currently being treated by a doctor at the Health Masters methadone clinic for opiate dependency and that he was presently taking methadone. (*Id.* at ¶ 20).  Teaford's physical examination included a drug urine sample, which tested positive for methadone. (*Id.* at ¶¶ 21-22; Docket No. 45 at ¶¶ 21-22).

### D.   Dr. Nackley's Evaluation & Recommendation

Dr. Daniel Nackley, M.D., M.S.C., was the Medical Director at Heritage Valley at the time Teaford was examined.[5] (Docket No. 36 at ¶ 23; Docket No. 45 at ¶ 23). He has been board certified in Occupational Medicine since 1992 and as a Medical Review Officer since 1996. (Docket No. 36 at ¶¶ 24-25). He has practiced exclusively in the field of occupational medicine and industrial hygiene for seventeen years. (*Id.*).

On July 31, 2007, he reviewed Teaford's positive drug test results for methadone. (*Id.* at ¶ 26). Then, on August 1, 2007, he contacted Teaford by telephone to discuss the positive test results and asked Teaford to list all the medications that he was currently taking. (*Id.* at ¶¶ 27-29; Docket No. 45 at ¶¶ 27-29). Teaford acknowledged that he was taking methadone pursuant to a doctor's prescription, upon which Dr. Nackley asked how long he had been taking it and under what circumstances. (*Id.* at ¶¶ 30-31).   Teaford answered that he was being treated for chemical dependency on opiates and that his methadone prescription was administered through a supervised methadone clinic. (*Id.* at ¶ 32).   Upon Dr. Nackley's request, Teaford provided the name and telephone number of his prescribing physician, Dr. Patricia Bonitatibus, M.D., the name of his clinic, Health Masters, and agreed to provide documentation confirming the legitimacy of his methadone

---

[5]

Dr. Nackley no longer practices at Heritage Valley; he currently practices with Allegheny Occupational Medicine Associates in Wexford, Pennsylvania. *See* http://www.wellness.com/dir/ 2424887/general-practitioner/pa/wexford/daniel-nackley-allegheny-occupational-med-md; last visited March 8, 2010.

prescription. (*Id.* at ¶¶ 33-34).

The EEOC maintains that Teaford told Dr. Nackley that he had obtained information on an "ADA website" suggesting that he did not have to disclose his methadone use; however, Hussey contends that Teaford told Dr. Nackley that his drug counselor, Amanda Hovancik ("Hovancik"), instructed him not to mention that he was taking methadone. (Docket No. 36 at ¶ 35; Docket No. 45 at ¶ 35; Docket No. 50 at ¶ 35). Upon further inquiry by Dr. Nackley, Teaford indicated that he had not participated in Alcoholics Anonymous or Narcotics Anonymous and that he was not attending meetings with either group. (Docket No. 36 at ¶ 36).

The following series of events occurred on August 3, 2007. Dr. Nackley received a letter from Hovancik and Dr. Bonitatibus verifying Teaford's treatment at Health Masters, and providing additional information concerning Teaford's treatment and counseling.[6] (Docket No. 36 at ¶ 37; Docket No. 45 at ¶ 37; Docket No. 38-7). Dr. Nackley then called Health Masters to speak with Dr. Bonitatibus and Hovancik, but was unable to reach them and left messages. (*Id.* at ¶ 38). He next sent Wendy Jones a copy of Teaford's drug test results, on which he stated his initial recommendation that Teaford not perform safety sensitive work due to his current medications. (*Id.* at ¶ 39). Upon Jones's receipt of same, she brought the report to the attention of James Clayton

---

[6]

The letter, dated August 2, 2007, states:

> This letter is to inform you that Donald Teaford is actively in treatment at this methadone treatment facility under the medical care of Dr. Patricia Bonitatibus. Don voluntarily entered Health Masters on 5/1/07. He is required to attend a minium of 2.5 hours of counseling per month with at least 1.0 hour of individual counseling, provide random monthly urine screens, participate in treatment planning every 60 days, and attend dosing 6 days a week (Monday through Saturday). Don is compliant in all areas of treatment, and his urine was favorable for the month of July.

(Docket No. 38-7). It is signed by Teaford's counselor, Amanda Hovancik. (*Id.*). On this letter, Dr. Nackley handwrote a note indicating that he tried called both Hovanick and Dr. Bonitatibus and left messages on August 3 and 6, 2007. (*Id.*).

("Clayton"), Hussey's Corporate Director of Human Resources and Labor Relations, who then instructed Jones to contact Dr. Nackley to seek clarification of his recommendation. (*Id.* at ¶¶ 40-41). Jones spoke to Dr. Nackley who indicated that he felt that because of his current medications, Teaford should not perform safety sensitive work, although he was in the process of contacting Teaford's doctors for further clarification. (*Id.* at ¶¶ 42-43). Dr. Nackley sent Hussey a form entitled "Conclusions of Employment Medical Exam," revised on August 3, 2007, in which he opined that Teaford's medications may affect his ability to perform safety sensitive work. (*Id.* at ¶ 44; Docket No. 38-10).

On August 7, 2007, Dr. Nackley spoke to Hovancik, who verified that Teaford was in drug treatment, had been using methadone pursuant to a prescription for a period of about two and one-half months and was currently taking 120 mg of methadone per day. (*Id.* at ¶ 45; Docket No. 38-7). Hussey contends that Dr. Nackley asked Hovancik if she had told Teaford not to disclose his methadone use and that she did not corroborate the same. (*Id.* at ¶ 46; Docket No. 50 at ¶ 46). Conversely, the EEOC claims that Dr. Nackley asked if a drug counselor, and not specifically Hovancik, had instructed Teaford and that Dr. Nackley "vaguely remember[ed]" that someone at the facility told Teaford not to mention his prescription. (Docket No. 45 at ¶ 46). The EEOC maintains that Teaford obtained information off of the internet regarding his disclose of his methadone use. (*Id.*; Docket No. 46-15).

Dr. Nackley and Jones spoke a second time between August 3 and 13, 2007, during which Dr. Nackley told Jones that he stood by his original recommendation. (Docket No. 36 at ¶ 47; Docket No. 45 at ¶ 47). As of that conversation, it appears that Dr. Nackley had not spoken with Teaford's treating doctor, and in fact, he told Jones that he was awaiting additional information from Dr. Bonitatibus. (Docket No. 45 at ¶ 47; Docket No. 50 at ¶¶ 47, 99). During this time period, Jones

7

spoke with Scott McGinnis, Hussey's head of safety and environmental issues, to discuss potential accommodations that could be made for a newly hired employee who could not perform safety sensitive work; however, McGinnis told her that all the jobs in the mill for production department laborers were safety sensitive. (Docket No. 36 at ¶ 48).  On this point, Clayton, the ultimate decision maker, admitted that he had not considered any form of accommodation other than whether Teaford should be denied any safety sensitive positions. (Docket No. 45 at ¶ 48; Docket No. 50 at ¶ 48).

On August 13, 2007, Jones had another conversation with Dr. Nackley during which he reaffirmed that he felt Hussey's mill was a safety sensitive environment and that Teaford should not be allowed to work in such an environment. (Docket No. 36 at ¶ 49; Docket No. 45 at ¶ 49). Dr. Nackley advised Jones that the federal Department of Transportation ("DOT") does not allow drivers to operate vehicles while on methadone.  (*Id.* at ¶¶ 50-51). He also advised that many employers in safety sensitive situations will not hire methadone treated people for safety sensitive work as the standard of care in the United States is that individuals on methadone do not perform safety sensitive work. (*Id.*).

### E.      Basis for Dr. Nackley's Recommendation

The area of the greatest dispute between the parties relates to Dr. Nackley's assessment of Teaford, as well as his qualifications and background in the use of methadone and its cognitive effects.  The parties' respective positions on the issue are as follows.

Hussey contends that Dr. Nackley's recommendation was based on a multi-faceted, "individualized assessment" of the following: Teaford's specific circumstances of his methadone use and disclosure of same, including his test results; conversations with him; review of documentation from Dr. Bonitatibus and Hovancik; information on Teaford's course of treatment and compliance; Teaford's failure to attend Narcotics Anonymous or Alcoholics Anonymous; and

Teaford's claim that he did not have to disclose his treatment. (Docket No. 36 at ¶¶ 52, 53; Docket No. 50 at ¶¶ 23, 52, 67, 78). His opinion was further premised on his analysis and understanding of the dangerous working situation at Hussey's copper mill, and the risk and safety threats posed by the pharmalogical side effects of methadone. (Docket No. 36 at ¶¶ 52, 54; Docket No. 50 at ¶¶ 52, 67, 76-77).  While Dr. Nackley had never personally visited Hussey's mill, he had driven by it and attested that he gained general knowledge about it from his conversations with Jones, who provided details about the specific job requirements for production laborers and the working conditions in the mill. (Docket No. 50 at ¶¶ 54, 94; Docket No. 45 at ¶ 94).

Hussey posits that Dr. Nackley's recommendation was derived from his knowledge of the standard in the United States concerning use of methadone,[7] and the accepted consensus in the medical literature in occupational medicine regarding the risks and threat to the safety of a person and their co-workers when a person is a long-term regular user of methadone and attempting to perform safety-sensitive work. (Docket No. 36 at ¶¶ 52, 56).  In this regard, Dr. Nackley testified as to his knowledge of the side effects of methadone in his capacity as an medical review officer ("MRO"), which include central nervous system depression, decrease in alertness and reaction time, memory deficits, decreased memory, lack of attention to detail and impairments in motor control. (*Id.* at ¶¶ 55, 64; Docket No. 50 at ¶ 77 ).  Additionally, based on his extensive experience with potential new hires testing positive for methadone, Hussey maintains that Dr. Nackley is thoroughly knowledgeable about the use and effects of methadone. (Docket No. 50 at ¶¶ 23, 57, 68, 77, 78). He has prescribed methadone for long-term pain management and has been directly told by individuals using the medicine that it negatively affected their cognitive function. (*Id.* at ¶¶ 57, 64). He also

---

[7] Specifically, Dr. Nackely testified about the standard of care reflected in DOT, Federal Aviation Administration ("FAA"), and Nuclear Regulatory Commission ("NRC") data studies. (Docket No. 50 at ¶ 23).

9

testified that he referenced the Physician's Desk Reference ("PDR"), which provides information on the neuro-cognitive deficits and the frequent side effects of methadone. (*Id.* at ¶¶ 57, 68).  While he did not know an exact percentage of people who were affected by the side effects of methadone, Dr. Nackley testified that according to the PDR, over 50 % of methadone users would suffer negative side effects including cognitive deficits. (*Id.* at ¶¶ 69, 83). Hussey also claims that Dr. Nackley indicated his understanding between the side effects of long-term methadone use and short-acting opiates. (*Id.* at ¶ 80).  But, the EEOC disputes this fact and claims that Dr. Nackley evidenced no understanding of the differing effects of long-term and short-term use. (Docket No. 45 at ¶ 80).

Hussey admits that Dr. Nackley is not certified to prescribe methadone as a treatment for drug addiction recovery nor has he ever worked in a drug rehabilitation facility. (Docket No. 50 at ¶ 64; Docket No. 45 at ¶ 64).  On this point, the EEOC cites to Dr. Nackley's testimony that he has never engaged in research nor published articles on the topic, nor could he cite to specific articles or studies during his deposition which supported his conclusion. (Docket No. 45 at ¶¶ 23, 68).  Rather, Dr. Nackley stated that he would not recommend for safety sensitive work any individual who used an opiate on a daily basis, pursuant to the standard of care in the United States. (*Id.* at ¶¶ 72, 77).

Additionally, the EEOC contests whether Dr. Nackley reviewed Teaford's medical history, considered the amount of methadone he was taking, and whether he referenced any scientific studies or articles prior to making his recommendation. (Docket No. 45 at ¶ 76-77, 82, 91; Docket No. 50 at ¶ 91). The EEOC contends that Dr. Nackley based his recommendation on Teaford's failure to disclose his methadone use and irrelevant subjective concerns such as "moral and ethical" obligations as well as both his and his employer's potential liability. (*Id.* at ¶¶ 84, 96).

Regarding his reliance on federal regulations, it is uncontested that there are no federal or state laws or regulations or internal Hussey policies that would have prohibited Hussey from hiring

Teaford. (Docket No. 45 at ¶¶ 79, 106; Docket No. 50 at ¶ 106).  It is also uncontested that Nurse Salyards's physical of Teaford did not include a neurological exam, which could have been used to determine the existence of cognitive impairment related to methadone use, although she was trained to conduct such a test. (Docket No. 45 at ¶¶ 85, 101, 123; Docket No. 50 at ¶¶ 85, 101, 123). In response, Hussey contends that this testing is "not the standard" in the pre-employment drug test situation. (*Id.*). However, it is undisputed that Dr. Nackley had cleared for continued employment an individual in methadone treatment after a neuro-cognitive assessment. (*Id.* at ¶ 102). Dr. Nackley also testified that he did not advise Hussey of another way to assess Teaford, nor did Hussey ask him for advice on potential methods of accommodation. (*Id.* at ¶ 103-104; Docket No. 50 at ¶¶ 104-105).

It is further uncontested that Dr. Nackley never asked Salyards for her first-hand impression of Teaford's cognitive well-being.  (*Id.* at ¶ 86). Nor did he ever meet with Teaford or perform his own physical examination. (*Id.* at ¶ 87).  In addition, Dr. Nackley did not inquire about Teaford's cognitive health with Hovancik, even though as a methadone clinic counselor, Hovancik would have been trained to observe patients and assess their mental status and the effects of methadone. (*Id.* at ¶ 88). These undisputed facts regarding Dr. Nackley's assessment are in contrast to his testimony that every situation involving the use of opiates is unique and involves various considerations, including frequency and time of usage, which need to be considered in making a recommendation regarding safety sensitive work. (Docket No. 50 at ¶ 72).

### F.    Rescission of Teaford's Conditional Offer

After each of Jones' conversations with Dr. Nackley, she communicated Dr. Nackley's opinion and recommendations to Clayton. (Docket No. 36 at ¶ 57; Docket No. 45 at ¶ 57). Clayton considered whether there was any way to accommodate Teaford's inability to receive medical clearance, however, he did not request advice from Dr. Nackley about methods of accommodation.

(Docket No. 36 at ¶ 58; Docket No. 45 at ¶ 58; Docket No. 50 at ¶ 58). As the supervisor of safety, environmental and health issues, and being very familiar with the safety risks of the manufacturing process and the mill's accident history, Clayton determined that Teaford's offer must be rescinded because he was not medically cleared to perform safety sensitive work which was an essential function of the position for which he applied. (*Id.* at ¶¶ 59, 61, 70, 95). He further determined that there was no way to accommodate a newly-hired employee in the production or maintenance department of the mill that could not do safety sensitive work, as every position in that department is safety sensitive. (*Id.* at ¶ 61). In arriving at this conclusion, Clayton considered that newly hired employees come in as "floaters" and that the agreement with the United Steelworkers requires that all jobs be awarded based on seniority. (*Id.* at ¶ 60; Docket No. 50 at ¶ 73).

In contrast, the EEOC claims that Clayton did not determine the level of direct threat allegedly posed by Teaford. (Docket No. 45 at ¶¶ 70, 73). To this end, it is uncontested that Clayton did not know what standards or guidelines Heritage Valley used in making a direct threat analysis for Hussey's work force. (Docket No. 45 at ¶ 71; Docket No. 50 at ¶ 71). Rather, the EEOC claims that Hussey's direct threat determination was based exclusively on Dr. Nackley's recommendation and not scientifically based objective facts. (Docket No. 45 at ¶¶ 74, 76).

On August 22, 2007, Hussey sent Teaford a letter indicating that based on the results from his medical evaluation, he was not deemed fit for the position of a production laborer. (*Id.* at ¶ 62). This decision was based Dr. Nackley's recommendation. (Docket No. 50 at ¶ 74). Despite Dr. Nackley's recommendation, it is undisputed that Teaford met all of the objective qualifications to perform the job. (Docket No. 45 at ¶ 100; Docket No. 50 at ¶ 100). The letter also informed Teaford that: "If in the future your medical status changes, you may reapply by submitting an employment application to once again be considered when a vacancy occurs." (Docket No. 36 at ¶ 63; Docket No.

45 at ¶ 63).

G.        Testimony of Dr. Trusandra Taylor[8]

Dr. Trusandra Taylor has been proffered by the EEOC as an expert in addiction medicine, which is recognized as a specialized area of medicine devoted to the care of patients suffering from addiction.[9] (Docket No. 45 at ¶¶ 107-108, 114). She has practiced in addiction medicine since 1985; she became certified in addiction medicine in 1990, and in 2005 she achieved fellow status with the American Society of Addiction Medicine. (*Id.* at ¶ 108).  Dr. Taylor currently serves as the medical director of several opioid treatment programs where she is charged with supervising all staff and spends at least 50 % of her time in direct patient care. (*Id.* at ¶ 109). She has experience in both in and out-patient opioid treatment programs and teaches other medical professionals in the field of addiction medicine. (*Id.* at ¶¶ 110-111).

Dr. Taylor testified that in her opinion, Teaford would not have been a direct threat to himself or others in Hussey's mill environment. (Docket No. 45 at ¶ 115; Docket No. 50 at ¶ 115).  She based her opinion on a review of the medical records created by Heritage Valley and Health Masters, Dr. Nackley's deposition testimony, and Hussey's job descriptions. (*Id.* at ¶ 116). She testified that based on Teaford's records, she believes he had reached stabilization after 91 days of treatment and that Heritage Valley's records did not evince any cognitive deficits. (*Id.* at ¶¶ 117-118). She also testified that patients taking methadone on a continuous basis achieve a steady state physiologically

---

[8]

The EEOC also proffered the testimony of Elvira Sisolak as an economic expert; she testified at her deposition that being excluded from safety sensitive positions rendered Teaford excluded from both a class of jobs and a broad range of jobs in various classes as compared to the average person in the Pittsburgh area with comparable training, skills, and abilities. (Docket No. 45 at ¶¶ 135-137).  As discussed *infra* in Section V, because Hussey has agreed for summary judgment purposes that the EEOC has established that Teaford is disabled under the ADA, the Court will not address issues raised by Sisolak's testimony.

[9]

Dr. Taylor received her medical degree from Hahneman Medical College University, and has completed a residency in internal medicine with a Master's degree in Public Health. (Docket No. 45 at ¶ 107).

in three months or less, after which they can function normally free of withdrawal symptoms. (*Id.* at ¶¶ 120-121). Based on Teaford's two and one-half months in treatment and current dosage as of July 31, 2007, Dr. Taylor opined that his body had reached a steady state. (*Id.* at ¶ 121). Dr. Taylor further testified that cognitive impairment is not a side effect in stabilized patients, and that current scientific literature related to methadone and cognitive function, as well as current expert opinion, do not overwhelmingly warn against hiring patients receiving methadone for safety sensitive positions. (*Id.* at ¶¶ 124, 131). While Dr. Taylor is not a medical review officer, she has taken medical review officer courses and has evaluated and approved methadone patients for safety sensitive work. (*Id.* at ¶ 130).

In Dr. Taylor's estimation, Dr. Nackley's stated standard of care in the United States is not substantiated by published literature; rather, the President's Office of National Drug Control Policy's ("ONDCP") fact sheet, dated April 2000, states that controlled methadone usage "does not impair cognitive functions" and "has no adverse side effects on mental capability, intelligence, or employability" as it "is not sedating or intoxicating, nor does it interfere with ordinary activities such as driving a car or operating machinery." (*Id.* at ¶ 128; Docket No. 46-11 at 3).[10] Pertinent here, the ONDCP reports that methadone is "one of the most monitored and regulated medical treatments in the United States...is a rigorously well-tested medication that is safe and efficacious for the treatment of narcotic withdrawal and dependence." (Docket No. 46-11 at 1). It also recounts the Drug Abuse Treatment Outcome Study ("DATOS"),[11] which conducted an outpatient methadone treatment evaluation examining the long-term effects of methadone. (*Id.* at 3).

---

[10]

*See also* http://www.whitehousedrugpolicy.gov/publications/pdf/ncj175678.pdf; last visited March 8, 2010.

[11]

*See* http://www.datos.org/adults/adults-1yrout.html; last visited March 8, 2010.

Hussey challenges Dr. Taylor's testimony in several respects. First, Hussey points out that Dr. Taylor is not board certified in internal medicine, not a medical review officer, and never spoke to Teaford or his treating physician before rendering her opinion. (Docket No. 50 at ¶ 12). Nor has she done any studies herself investigating the cognitive functions of methadone patients. (*Id.*) Second, Hussey cites Dr. Taylor's testimony that Teaford's dosage of 120 milligrams is at the high end of the dosage range and that higher dosages are more likely to cause side effects. (*Id.* at ¶ 121). Third, Dr. Taylor's opinion as to whether Teaford is stabilized in his methadone use assumes several factors not in evidence. (*Id.* at ¶ 124). While Hussey objects generally to Dr. Taylor's statements that Dr. Nackley's standard of care is unsubstantiated, it does not contest the ONDCP report on methadone. (*Id.* at ¶¶ 120, 123, 124-125, 128, 131).

## III.   Procedural History

The EEOC initiated this action on June 17, 2008 with the filing of its Complaint. (Docket No. 1). Hussey filed its Answer on July 15, 2008, after which the Court convened a case management conference on August 21, 2008 and issued a case management order. (Docket Nos. 5, 11, and 12 respectively). Fact discovery closed on January 20, 2009.[12] (*See* Docket No. 16). On February 5, 2009, the Court set down deadlines for the completion of expert discovery by April 6, 2009, and the filing of motions for summary judgment by May 20, 2009. (Docket No. 18). Thereafter, on April 2, 2009, the Court granted a motion by the EEOC to amend/correct its Complaint, seeking to withdraw its claim for compensatory and punitive damages, thereby removing the right to a trial by jury. (Docket Nos. 19, 22). The EEOC filed its Amended Complaint that same

---

[12] This case was referred to mediation pursuant to this Court's ADR policies and procedures. (Docket Nos. 13 and 14). On February 4, 2009, the Court convened a settlement conference with the parties and counsel, however, the case was not able to be resolved. (Docket No. 17).

day (Docket No. 24), to which Hussey filed its Answer on April 22, 2009.[13] (Docket No. 24).

On June 4, 2009, the Court held a telephone status conference with counsel for the parties to address the EEOC's previously filed motion for leave to supplement its Rule 26(a) initial disclosures and reopen discovery for limited purposes. (Docket Nos. 31 and 27, respectively). During said conference, the Court granted the EEOC's motion and held in abeyance the deadlines for summary judgment motions. (Docket No. 31). The Court further ordered Plaintiff to submit its supplemental initial disclosures and produce the report of its economic expert by July 10, 2009, Hussey was given until August 10, 2009 to depose said expert. (Docket No. 32). The new deadline for the filing of motions for summary judgment was September 10, 2009. (*Id.*).

On September 10, 2009, Hussey filed its Motion for Summary Judgment, Concise Statement of Material Facts, Brief in Support, Appendix, as well as certain exhibits under seal with leave of Court. (Docket Nos. 35, 36, 37, 38, 41, 42, and 43). After being granted additional time to do so (Docket Nos.33 and 34), on November 9, 2009, the EEOC filed its Response in Opposition, its Response and Objections to Hussey's Concise Statement of Material Facts, and its Appendix. (Docket Nos. 44, 45, and 46). After another enlargement of time, Hussey filed its Reply, Response to EEOC's statement of facts, and reply Appendix on November 30, 2009. (Docket Nos. 49, 50, and 51). The EEOC filed a motion for leave to file a sur-reply by December 21, 2009 (Docket No. 52), which the Court granted (Docket No. 53); however, no such sur-reply was filed. Consequently, Hussey's Motion for Summary Judgment (Docket No. 35) is ripe for disposition.

## IV.    Standard of Review

Summary judgment may only be granted "if the pleadings, depositions, answers to

---

[13]

      Thereafter, the Court granted two motions for an enlargement of time to file summary judgment motions by Hussey, to which the EEOC consented. (Docket Nos. 25 and 26).

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A motion for summary judgment will only be denied when there is a genuine issue of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-248 (1986).

In determining whether the dispute is genuine, the court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. The court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy*, 413 F.3d at 363; *Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n.3 (3d Cir.1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir.1994)). In evaluating the evidence, the court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. *Watson v. Abington Twp*., 478 F.3d 144, 147 (3d Cir.2007). As to materiality, the relevant substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

V.    **Discussion**

Title I of the ADA provides, as a general rule, that "[n]o covered entity shall discriminate

against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *Hohider v. UPS*, 574 F.3d 169, 186 (3d Cir. 2009).[14]

Courts reviewing discrimination claims under the ADA apply the *McDonnell Douglas* burden-shifting analysis. *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667-68 (3d Cir. 1999). In order to prevail under the ADA, a plaintiff must first establish a prima facie case by producing evidence sufficient to support an inference of discrimination. Here, the EEOC must demonstrate the following: (1) Teaford is disabled, as defined by the ADA; (2) he is qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) he suffered an adverse employment action as a result of discrimination. *Buskirk v. Apollo Metals*, 307 F.3d 160, 166 (3d Cir. 2002); *Marinelli v. City of Erie*, 216 F.3d 354, 363 (3d Cir. 2000). If the EEOC satisfies this burden, as Hussey has acknowledged consideration of Teaford's disability in its decision, then the burden shifts to Hussey to rebut the inference of discrimination by demonstrating that it was relevant to the job qualifications. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). In other words, Hussey must show that although it relied on Teaford's disability in taking the adverse action, it was a permissible and appropriate factor to consider with respect to the Teaford's qualifications under the circumstances. *Id.* at 506-07; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  If Hussey successfully does so, the burden of persuasion then shifts back to the EEOC to demonstrate that the legitimate reasons proffered by Defendant were not its true reasons, "but were a pretext for discrimination." *Burdine*, 450 U.S. at 253.

Regarding the first part of the prima facie case, the ADA provides that a disability includes:

---

[14] Hussey does not contest that it is an employer subject to the ADA. (*See* Docket No. 36; Docket No. 37).

"(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such impairment." 42 U.S.C. § 12102; *see also Bragdon v. Abbott*, 524 U.S. 624, 632 (1998). Here, Hussey does not contest,[15] for the purposes of summary judgment, that Teaford has a record of disability and/or was regarded as disabled.[16] (Docket No. 49 at 8). Nor does it contest that Teaford suffered an adverse employment action as a result of his disability. (Docket No. 37). Hussey does challenge, however, whether Teaford is a "qualified individual." (*Id.*; Docket No. 49). Therefore, the Court's analysis will focus on this part of the EEOC's prima facie case under the ADA.

## A.    Qualified With or Without Reasonable Accommodation

A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The Code of Federal Regulations divides this inquiry into two parts: (1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position. 29 C.F.R. § 1630.2(m); *see also  Gaul v. Lucent Techs.*, 134 F.3d 576, 580 (3d Cir. 1998);

---

[15]

While Hussey did argue extensively in its Brief in Support of its motion as to whether Teaford has a record of disability or was regarded as disabled (*see* Docket No. 37 at 13-16), in its Reply Brief in Response to the EEOC's opposition, it agreed that for summary judgment purposes Teaford was perceived to be disabled and/or had a record of disability. (Docket No. 49 at 8).

[16]

In relation to Teaford's history of drug addiction and current rehabilitative methadone use, the Court notes that by including "recovering drug addicts among those to be protected under the ADA, Congress recognized 'that many people continue to participate in drug treatment programs long after they have stopped using drugs illegally, and that such persons should be protected under the Act." *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir. 2002)(quoting H.R. Conf. Rep. No. 101-596, at 65, reprinted in 1990 U.S.C.C.A.N. 267, 573). Congress has recognized that drug addicted individuals recovering by participation in drug treatment programs, such as the one in this case, might still face discrimination and be entitled to protection under the ADA. *Id.*; *see also New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293 (3d Cir. 2007)(noting that recovering heroin addicts are presumptively "qualified" persons under the ADA.). A person who is no longer engaging in drug use shall be deemed a qualified individual. 42 U.S.C. 12210(a) and (b)(1); 29 U.S.C. 705(20)(C)i) and (C)(ii)(I).

and *Hohider*, 574 F.3d at 189.

The parties do not dispute the first prong of the inquiry, that is, that Teaford possessed the requisite experience, skill, or education for the production laborer position. (Docket No. 45 at ¶ 100; Docket No. 50 at ¶ 100). As to the second prong, Hussey argues that an essential function of the position is the ability to do safety sensitive work, and that Teaford did not have that ability because he failed to achieve the required medical clearance to perform in the mill environment. (Docket No. 37 at 16-17, 19). The EEOC does not dispute Hussey's description of the duties of a production laborer or that the position entailed safety sensitive work. (Docket No. 44 at 14). Instead, the EEOC argues that Teaford was able to perform safety sensitive work, yet Hussey erroneously regarded him as disabled because of his methadone treatment based upon its failure to conduct an individualized assessment of Teaford. (Docket No. 44 at 15-16). The EEOC is also claiming that Teaford could perform the essential tasks of the job without any accommodation. Hence, the EEOC must show that though Teaford was disabled, or regarded as disabled, that he could perform the essential functions of the job. *Kresge v. Circuitek*, 958 F.Supp.223, 226 (E.D. Pa. 1997).

The Supreme Court, in a triad of cases, has made clear that the ADA requires an individualized inquiry into the ability of an employee or applicant to perform a particular job, one which focuses on the medical condition's actual effect on the specific plaintiff. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999); *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516 (1999); and *Albertson, Inc. v. Kirkinburg*, 527 U.S. 555 (1999). In conjunction with this requirement, the Court of Appeals for the Third Circuit has held that under the ADA, it is the employer's burden to educate itself about the varying nature of an impairment and to make individualized determinations about affected employees, or here, applicants. *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 193 (3d Cir. 1999). "When an impairment is the type whose symptoms will vary greatly from person to person,

[employers] must engage in an individualized assessment of the effect of the impairment" in the applicant or employee's own experience. *Britting v. Shineski*, Civ. A. No. 08-1747, 2010 U.S. Dist. LEXIS 10190, at * 15 (M.D. Pa. Feb. 5, 2010)(citing *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 199 (2002)).

In the instant case, Hussey argues that Dr. Nackley completed his due diligence in making his recommendation based on a comprehensive, individualized assessment of Teaford's ability to work in a safety sensitive environment in accordance with his knowledge of the essential functions of the production laborer position and the standard of care. (Docket No. 50 at ¶¶ 89, 93, 99). Conversely, the EEOC claims that Hussey did not conduct the required individualized assessment, but that only a "cursory examination" of Teaford was performed. (Docket No. 45 at ¶¶ 85, 123).  To this end, the EEOC argues that Dr. Nackley's recommendation was based on a rushed assessment prior to the completion of a full inquiry and an unsubstantiated standard of care. (*Id.* at ¶¶ 97-99, 128).

 For the following reasons, the Court finds that the EEOC has established genuine issues of material fact as to whether Hussey engaged in the necessary individualized assessment of Teaford's condition.

The Court first notes that it is undisputed that Dr. Nackley did not meet with or personally examine Teaford.  *C.f. Lewis v. Pennsylvania*, 609 F.Supp.2d 409 (W.D. Pa. 2008)(physician who made recommendation regarding potential employment personally examined and evaluated the plaintiff; thus, he completed an "individualized assessment"). Rather, the record before the Court appears to show that he based his opinion on Nurse Salyards's evaluation and his knowledge gained from various literary sources about methadone, while he never personally examined Teaford nor did he speak with Teaford's prescribing physician, Dr. Bonitatibus. (Docket No. 50 at ¶¶ 47, 99). *See also Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 192-93 (3d Cir. 1999)(employers must make

individualized determinations about the disabilities of employees).

Additionally, the EEOC has established that Dr. Nackley did not ask Teaford about his own experience with the methadone's effect on cognitive functions, even though he did ask why Teaford failed to disclose his methadone prescription. *See Britting*, 2010 U.S. Dist. LEXIS 10190, at *15. Moreover, Hussey had no information or reason to believe that Teaford had previously or was currently suffering from cognitive defects as a result of his methadone usage. Indeed, there is no record evidence showing that Teaford had ever experienced any side effects related to his methadone use. Dr. Nackley never inquired of Salyards, Hovancik, or Dr. Bonitatibus as to whether Teaford demonstrated any cognitive deficits evincing that he was not qualified to do safety sensitive work, despite the fact that they all had the opportunity to observe Teaford while he was on methadone. (Docket No. 36 at ¶¶17, 37, 38-39; Docket No. 45 at ¶¶17, 37, 38-39). On this point, Dr. Taylor testified that based on Teaford's records, she believed Teaford would have reached stabilization physiologically by the time he applied for employment with Hussey. (Docket No. 45 at ¶¶ 117-118, 120-121).

Finally, Hussey does not dispute that a neuro-cognitive examination was available to assess Teaford's ability to safely perform the job, that Dr. Nackley had used such a test in the past, and that it was not utilized in this case. (Docket No. 45 at ¶¶ 101-02, 123; Docket No. 50 at ¶¶ 101-02, 123). Instead, Hussey speculates as to possible safety concerns which could have arisen if Teaford were employed, without any indication that Teaford's methadone use actually impeded his ability to safely perform as a production laborer. These circumstances alone raise material issues of fact. As a result, this Court cannot accept Dr. Nackley's report as dispositive evidence of Teaford's alleged inability to safely work in the mill where (i) the EEOC has adduced sufficient evidence to raise an issue of fact as to whether an individualized inquiry was conducted as mandated by the ADA, and (ii) it is

22

undisputed that Teaford was otherwise qualified to perform the job in question.

Accordingly, because the Court cannot say as a matter of law that Teaford was not qualified for the job in light of his methadone use, Hussey is not entitled to summary judgment.

### B.    Direct Threat Exception

Hussey argues that even if Teaford is considered to be qualified, the record before this Court establishes as a matter of law that Teaford would present a direct threat to the health or safety of others if he were allowed to work in the mill. (Docket No. 37 at 19). Hussey contends that it had a reasonable belief, based on Dr. Nackley's recommendation, to disallow Teaford to perform safety sensitive work because allowing him to do so would have posed a serious threat to others in the mill. (*Id.* at 19-20). Therefore, it acted appropriately under the ADA's direct threat exception in rescinding Teaford's offer. (*Id.* at 20). The EEOC argues in response that Hussey has not established as matter of law that Teaford would have been a direct threat. (Docket No. 44 at 19-20). Instead, the EEOC argues that Hussey relied on Dr. Nackley's unsubstantiated standard of care and misunderstanding of the difference between short-acting opiates and methadone. (*Id.* at 20). It further argues that Hussey and Dr. Nackley failed to compute the likelihood of potential harm, rely on available objective information on Teaford's cognitive health, or obtain the best evidence through the use of the available cognitive assessment test. (*Id.* at 21-22).

In *Bragdon*, *supra*, the Supreme Court noted that the ADA's recognized goal of ending disability discrimination must be balanced against the health and safety risks that a disability sometimes poses to others. *Bragdon*, 524 U.S. at 648-49; *see also* 42 U.S.C. § 12182(b)(3).[17] The

---

17

Section 12182(b)(3) provides:
> Nothing in this [subchapter] shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a direct threat to the health or safety of others. The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies,

direct threat exception[18] allows discrimination if a disability "poses a direct threat to the health and safety of others," that cannot be eliminated by a modification of policies, practices, or procedures, or with the provision of additional aides or services. 28 C.F.R. Part 35, App. A at 483; *see also Doe v. County of Ctr.*, 242 F.3d 437, 447 (3d Cir. 2001); 42 U.S.C. § 12182(b)(3). The Code of Federal Regulations define a direct threat as:

> [A] determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm.

29 C.F.R. § 1630.2(r). These factors were originally delineated in *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 288 (1987)(analyzing the risk of communicating an infectious disease to others in the workplace), *superseded by statute on other grounds*; *Shiring v. Runyon*, 90 F.3d 827 (3d Cir. 1996). The employer bears the burden of proving that an employee or applicant poses a direct threat. *Clark v. SEPTA*, Civ. A. No. 06-4497, 2008 U.S. Dist. LEXIS 5466, at *26 (E.D. Pa. Jan. 25, 2008)(citation omitted).

The Supreme Court has further explained that "[t]he exception can only be invoked where a risk is significant: 'because few, if any, activities in life are risk free . . . the ADA does not ask whether a risk exists, but whether it is *significant*.'" *Doe*, 242 F.3d at 447 (quoting *Bragdon*, 524

---

practices, or procedures or by the provision of auxiliary aids or services. 42 U.S.C. § 12182(b)(3).

[18] The direct threat exception was judicially created by the Supreme Court's holding in *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 n.16 (1987). Subsequently, Congress amended the ADA to include the court's direct threat language. *See Bragdon*, 524 U.S. at 649.

U.S. at 649)(emphasis added).  A slightly increased risk, a mere speculative or remote risk is insufficient; there must be a high probability of substantial harm. 29 C.F.R. § 1630.2(r). In conducting this evaluation, courts and entities "must rely on evidence that 'assesses the level of risk' for the 'question under the statute is one of statistical likelihood.'" *Id.* (quoting *Bragdon*, 524 U.S. at 625). This "rigorous objective inquiry" must be based on medical or other objective evidence, applying the four factors set out in *Arline*. *Bragdon*, 524 U.S. at 626; *see also Haas v. Wyo. Valley Health Care Sys.*, 553 F.Supp.2d 390, 398 (M.D. Pa. 2008). Relevant here, "a health care professional...[has] the duty to assess the risk...based on the objective, scientific information available to him and others in his profession. His belief that a significant risk existed, even if maintained in good faith, [will] not relieve him of liability." *Bragdon*, 524 U.S. at 649.

In short, a court's analysis of a potential "direct threat" cannot be based on subjective judgments, but on "the best available objective evidence" in the record of any dangers posed by methadone patients. *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 306 (3d Cir. 2007); 29 C.F.R. § 1630.2(r). The Court will thus consider the objective record evidence to determine whether a genuine issue of fact exists as to the significance of the risk allegedly posed by Teaford. *See New Directions*, 490 F.3d at 305 (noting that the *Arline* decision was not limited to cases of infectious disease and other courts have expanded the test to other disabilities)(other citations omitted).

Despite Hussey's arguments, it has not produced evidence supporting its contention that there is no issue of fact as to whether Teaford posed a high probability of substantial harm to himself or others. In essence, the only information on which Hussey based its decision is the conclusion of Dr. Nackley, and, as the Court found above, the speculation that there may be future manifestations of side effects from Teaford's use of methadone. (Docket No. 36 at ¶¶ 57, 68, 69, 80, 83). Dr. Nackley

acknowledged that every situation involving the use of opiates is unique and involves various considerations and, to this end, that a neurological exam was available to conduct such an assessment. (Docket No. 45 at ¶¶ 85, 101, 123; Docket No. 50 at ¶¶ 85, 101, 123, 72). Yet, such an exam was not conducted in this instance. (*Id.* at ¶¶ 101-103). In addition, although Dr. Nackley consulted various medical resources and literature to gain knowledge about the cognitive effects of methadone, he admittedly found no need to examine Teaford himself or inquire about Teaford's cognitive health with Salyards, who in fact did examine him. (Docket No. 45 at ¶¶ 85-87; Docket No. 50 at ¶ 85-87). *See EEOC v. Burlington Northern & Santa Fe Ry.*, 621 F.Supp.2d 587 (6th Cir. 2009)(denying summary judgment as to direct threat exception where physician never personally examined the plaintiff). Moreover, the record demonstrates that the examination that Salyards performed did not reveal that Teaford suffered from any methadone-related side effects. (*See* Docket No. 36 at ¶¶ 17-18; Docket No. 45 at ¶¶ 17-18).

Additionally, the Interpretive Guidance section of the ADA, 29 C.F.R. Pt. 1630, App., provides that relevant evidence in determining whether a direct threat exists "may include input from the individual with the disability, the experience of the individual with a disability in similar positions, and opinions of medical doctors, rehabilitation counselors, or physical therapists who have expertise in the disability involved and/or direct knowledge of the individual with the disability." *Id.* Here, however, it is undisputed Dr. Nackley failed to ask Teaford himself whether he had ever experienced methadone-related complications or inquire with his drug counselor, Hovancik, and treating doctor, Dr. Bonitatibus, about their opinions concerning the effects of his methadone use. (Docket No. 45 at ¶¶ 86-88; Docket No. 50 at ¶¶ 86-88). Furthermore, it is disputed whether Dr. Nackley considered Teaford's complete medical and work history.(*Id.* at ¶¶ 82, 84, 90).

In light of the foregoing facts and the relevant federal guidelines and regulations as

interpreted by the courts, this Court cannot say as a matter of law that the physical examination by Salyards and review by Dr. Nackley constituted an individualized assessment, as required by 29 C.F.R. 1630.2(r), such that Hussey's decision that Teaford was a direct safety threat was objectively reasonable. Therefore, the Court finds that Hussey has failed to establish that there are no genuine issues of material fact regarding whether Teaford posed a direct threat. *See* 29 C.F.R. § 1630.2(r); *Bragdon*, 524 U.S. at 625. Accordingly, Hussey is not entitled to summary judgment on the ADA's direct threat exception.

**VI.      Conclusion**

For the foregoing reasons, Hussey's Motion for Summary Judgment (Docket No. 35) is DENIED. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:          March 12, 2010.
CC/ECF:     All counsel of record.